## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United Healthcare Services, Inc.,                    Civil No. 23-2890 (DWF/ECW)

             Plaintiff,

v.

                                          **MEMORANDUM**

AmerisourceBergen Corporation;                    **OPINION AND ORDER**
AmerisourceBergen Drug Corporation;
AmerisourceBergen Specialty Group,
LLC; ASD Specialty Healthcare, LLC
*d/b/a* Oncology Supply Company; and
Medical Initiatives, Incorporated *d/b/a*
Oncology Supply Pharmacy Services,

             Defendants.

## INTRODUCTION

This matter is before the Court on a motion to dismiss Plaintiff United Healthcare

Services, Inc.'s ("UHS" or "Plaintiff") first amended complaint (Doc. No. 77 ("FAC"))

brought by Defendants. (Doc. No. 80.) UHS opposes the motion. (Doc. No. 86.) For

the reasons set forth below, the Court grants the motion.

## BACKGROUND

The facts of this complex case were set forth in the Court's April 24, 2024 Order

(Doc. No. 56 (the "April 2024 Order")) and the Court's January 10, 2025 Order (Doc.

No. 76 (the "January 2025 Order")). Those facts are incorporated herein. To recap,

Plaintiff alleges that between 2001 and 2014, Defendants[1] perpetrated an unlawful scheme (the "Program" or "PFS Program") to distribute and sell doses of adulterated drugs that were administered to patients, many of whom were insured under programs operated by Plaintiff.  (*See generally* FAC.)

The Program involved Defendant MII, which created pre-filled syringes ("PFS") of oncology drugs at its facility in Dothan, Alabama for ABC Specialty to sell or distribute to healthcare providers.  (*Id.* ¶ 257.)  After receiving a healthcare provider's order, MII would draw the drug from vials produced by the manufacturer in a syringe to be shipped to the provider.  (*Id.*)  MII would then keep any excess product in the vial (the "overfill"), which would be used to fill later prescriptions.  (*Id.*)  MII would then ship the PFSs and invoiced the drugs for a vial according to the original FDA approval.  (*Id.* ¶¶ 28, 260-65, 172-95, 280.)  UHS alleges that in creating the PFSs, MII employees left vials in non-sterile containers.  (*Id.* ¶¶ 64-65.)  UHS further alleges that the Program lacked necessary quality assurance and security testing.  UHS argues that the PFS Program failed to comply with manufacturing practices and federal guidelines, and that

---

[1]    For convenience, the Court refers to Defendants collectively when not referring to a specific defendant. As laid out in the April 2024 Order, Defendants include: AmerisourceBergen Corporation ("AmerisourceBergen"), its subsidiaries AmerisourceBergen Drug Corporation and AmerisourceBergen Specialty Group, LLC ("ABC Specialty").  Defendant ASD Specialty Healthcare LLC d/b/a Oncology Supply ("Oncology Supply") is a former division or subsidiary of ABC Specialty and was a pharmaceutical wholesaler that is no longer in business.  Defendant Medical Initiatives, Inc. d/b/a Oncology Supply Pharmacy Services ("MII") operated out of an Alabama facility of Oncology Supply.  MII was acquired by AmerisourceBergen in 2001.

as a result ABC Specialty sold "adulterated, dangerous, tainted, effectively worthless" product that "had no market value." (*Id.* ¶¶ 8, 10.)

The PFS Program ran between 2001 and 2014, and MII ceased operations on January 31, 2014. (*Id.* ¶¶ 2, 55, 246, 382; *Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, C.A. No. 2019-0816-SG, 2023 WL 7986729, at *17 (Del. Ch. Nov. 17, 2023).) Notably, Defendants did not sell syringes directly to UHS and UHS did not pay Defendants directly for any syringes. (*Id.* ¶¶ 40, 269.) Instead, providers purchased the syringes from Defendants, administered them to patients, and then sought reimbursement from patients' insurers. (*Id.* ¶ 40*.)* Some patients were insured under plans offered by UHS subsidiaries and affiliates. (*Id.*)

The PFS Program was the subject of prior civil actions and government investigations, which were disclosed in Defendants' filings with the Securities and Exchange Commission ("SEC") and in other public sources starting in 2010. The Court took judicial notice of the SEC filings, materials posted on governmental websites, and news reports to the extent that a report demonstrated that information was available at a certain point in time. As noted previously, AmerisourceBergen disclosed in annual reports that the Dothan facility was under federal investigation. (April 2024 Order at 3-5.) In November 2016, Amerisource Bergen's annual report publicized the fact that the U.S. Attorney for the Eastern District of New York "has expressed an intention to pursue potential civil and criminal charges based upon the FDCA and False Claims Act." (Doc. No. 30-7 at 3.)

On September 27, 2017, the U.S. Attorney publicly filed a Criminal Information charging ABC Specialty with a strict liability misdemeanor under the FDCA based on the introduction of misbranded drugs into interstate commerce. (FAC ¶ 249.) On the same day, ABC Specialty pleaded guilty to a one-count strict liability misdemeanor violation of the FDCA for failing to register MII as a "repackager" of drugs. (*Id.* ¶ 254.) ABC Specialty agreed to pay a $208 million criminal fine and $52 million in a criminal money forfeiture. (*Id.* ¶ 256.) And in October 2018, Defendants entered into a civil settlement with the United States in three *qui tam* False Claims Act actions. (*Id.* ¶ 257.) The allegations in these actions related to sales of the same products at issue in the criminal case. Defendants agreed to pay $625 million to compensate the federal government and state Medicaid programs for alleged "false claims" submitted for unapproved drugs or drugs that did not meet quality standards. (*Id.*)

UHS brought this action on September 19, 2023, based on conduct that ended in 2014 and that is the subject of the 2017 misdemeanor plea and 2018 civil settlement. In the April 2024 Order, the Court concluded that Plaintiff's claims were time-barred, based in part on two findings—(1) that information contained in several SEC filings and a media story triggered the statute of limitations on Plaintiff's fraud claims and ended tolling; and (2) that Plaintiff failed to plead with sufficient particularity that Defendants engaged in fraudulent concealment and that Plaintiff could not have diligently discovered its claims before January 22, 2017. Plaintiff filed a motion for relief from judgment, arguing that it should be allowed to amend the complaint to add allegations regarding tolling and to cure any pleading deficiencies in the original complaint. (Doc. No. 58.)

The Court granted Plaintiff relief in part, vacating the judgment and allowing Plaintiff to file an amended complaint to attempt to address pleading deficiencies. The Court indicated that it would then revisit, via anticipated motion practice that has now come to pass, whether Plaintiffs could have, with reasonable diligence, filed this lawsuit before January 22, 2017. Defendants have filed a motion to dismiss the FAC in its entirety, including for failure to state a claim on the merits, which the Court considers below.

## DISCUSSION

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6). *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative

level." *Id*. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

In addition, Federal Rule of Civil Procedure 9(b) requires "particularity" when pleading fraud or mistake. Fed. R. Civ. P. 9(b). Rule 9(b) applies to all claims premised on fraud, including "claims of false advertising, deceptive trade practices, unlawful trade practices, and consumer fraud." *Select Comfort Corp. v. Sleep Better Store, LLC*, 796 F. Supp. 2d 981, 983 (D. Minn. 2011); *see also Wright & Miller's Federal Practice & Procedure* § 1297 (4th ed.) (database updated May 20, 2025) ("Beyond traditional fraud, asserting claims premised on fraudulent conduct can trigger the obligation to plead with particularity."). To satisfy Rule 9(b), the complaint must plead the "who, what, when, where, and how" of the alleged fraud. *Freitas v. Wells Fargo Home Mortg., Inc.*, 703 F.3d 436, 439 (8th Cir. 2013).

In the FAC, UHS alleges the following claims: (1) common law fraud/fraudulent concealment; (2) Minnesota Consumer Fraud Act (Minn. Stat. § 325F.69); (3) Minnesota Unlawful Trade Practices Act (Minn. Stat. § 325D.13); (4) deceptive acts against senior citizens (Minn. Stat. § 325F.71); (5) Minnesota Unfair and Deceptive Trade Practices Act

(Minn. Stat. § 325D.44)); and (6) unjust enrichment/money had and received.

Defendants move to dismiss all claims.[2]

## I.    Statutory and Common Law Fraud

At the heart of this case are UHS's allegations that Defendants engaged in fraud in violation of both statutory and common law.  Specifically, UHS alleges that Defendants made express and implied false statements and fraudulent omissions to oncology providers, regulators, and the general public with the intent to induce reliance by providers and insurers when submitting and paying insurance claims.  Defendants move to dismiss UHS's fraud claims arguing that the alleged facts do not support a finding of fraud.  In addition, Defendants argue that UHS was not harmed and cannot plead damages.

Under any theory of fraud, statutory or common law, UHS must allege, with particularity, a false statement or actionable omission.  *See Trooien v. Mansour*, 608 F.3d 1020, 1028 (8th Cir. 2010) (citing *Hoyt Props., Inc. v. Prod. Res. Grp., LLC*, 736 N.W.2d 313, 318 (Minn. 2007)) (common law fraud elements); *Luckey v. Alside, Inc.*, 245 F. Supp. 3d 1080, 1095 (D. Minn. 2017) (statutory consumer fraud elements).

### A.    Statements Received by UHS

First, UHS alleges that Defendants made certain specific statements about their commitment to safety and legal compliance that UHS received and relied on to its detriment.  Those statements include the following:

---

[2]    Defendants maintain that UHS's claims are untimely.  However, because Defendants' main arguments go to the merits of the claims, the Court starts there.

| 2011 | "Given cancer patients' vulnerable condition, great attention to infection prevention is warranted throughout the course of their care."<br><br>"Preventing infections during treatment can result in significant decreases in morbidity and mortality for cancer patients."<br><br>Link to CDC's website on preventing infections in cancer patients. |
|------|---|
| 2016 | "Follow the letter of the law.  Being vigilant about the latest regulatory changes to reimbursement structures can ensure a practice remains compliant and maximizes the payments available."<br><br>"Err on the safe side.  Sometimes it's not about plugging a leak but heading off a potentially costly mistake before it occurs.  For example, when a practice obtains a drug from the manufacturer free of cost, it must catalogue that product as a free drug in the billing system." |
| 2022 | "Cutting-edge compliance solutions" to promote safety and leverage experience to make the "purchasing process easy and reliable."<br><br>"AmerisourceBergen's manufacturer operations team prioritizes patient safety."<br><br>"You can rely on us."<br><br>"Every major decision we make is shaped by input from our dedicated panel of practicing physicians, pharmacists, nurses and practice administrators."<br><br>"We expect our manufacturer trading partners to follow those guidelines" including the "HDA Guidelines for Barcoding in the Pharmaceutical Supply Chain." |

(FAC ¶¶ 125, 127-28, 130, 132-33 (citation modified).)

### 1.    Fraudulent Statement

Defendants argue that these statements are not actionable as fraud.  First,

Defendants argue that these are generalized statements about the safety and legal

compliance and, as such, they do not meet the standard for fraud under common or

statutory law.  To support this argument, Defendants rely on *Bernstein v. Extendicare*

*Health Services, Inc.*, 607 F. Supp. 2d 1027 (D. Minn. 2009). In *Bernstein*, a resident in a nursing home sued its owners under several consumer fraud statutes based on alleged "false representations regarding the quality of care in [the nursing home] facilities." *Id.* at 1029. The defendants moved to dismiss, arguing that the statements upon which the plaintiff's claims were based on were "non-actionable 'puffery.'" *Id.* at 1031. Those statements included, for example, that the nursing home would comply with or exceed applicable laws, had rigorous standards, and that the services provided would be "high quality." *Id.* at 1030. The Court in *Bernstein* agreed and explained that the statements were:

> [s]o general and unspecific that they cannot serve as the basis for a claim under any of the consumer protection statutes upon which Plaintiff relies. None of the statements reference[d] any particular standard or makes any specific promise. Statements that a nursing home will comply with or exceed "applicable laws," or that it has established "rigorous standards," are similar to statements that services provided will be "high quality." These statements are puffery.

*Id.* at 1032[3]; *see also Leonard v. Abbott Lab'ys, Inc.*, No. 10-CV-4676, 2012 WL 764199, at *22 (E.D.N.Y. Mar. 5, 2012) (finding that the statement by the manufacturer of infant powder formula that was recalled for potential contamination that it was "dedicated to the highest standards of manufacturing and marketing" and "complying with all applicable laws and regulations" is not actionable under consumer fraud statutes; noting the "aspirational statement" was "simply too vague for a reasonable consumer to rely on").

---

[3]    Notably, the Court in *Bernstein* explained that it was possible that defendants were violating state laws and regulations by not providing adequate care to residents, that other state laws might provide a remedy, and that a consumer protection action was "simply not the path to resolution." *Bernstein*, 607 F. Supp. 2d at 1032.

9

In addition, the Court in *Bernstein* explained that the statement that the services in the nursing home would be provided "as required by law" was a redundancy because nursing homes are required to provide services under a comprehensive regulatory scheme. *Bernstein*, 607 F. Supp. 2d at 1032. As such, the statement did not create a promise independent of the legal obligations already imposed. *Id.*

Like in *Bernstein*, the statements here are too vague and unspecific to be actionable under consumer fraud statutes or common law fraud. The statements do not make reference to any particular safety or compliance standard or make a specific promise. Instead, the statements speak generally to safety ("follow the letter of the law," "vigilant about the latest regulatory changes," "err on the safe side") and Defendants' promotion of safety through the use of "cutting-edge compliance solutions," the prioritization of patient safety, and "input from [Defendants'] dedicated safety panel." Notably, there is no evidence that any of these statements were made with respect to or in specific reference to the PFS Program as opposed to Defendants' practices generally.[4]

Because none of these generalized statements are actionable as false statements, UHS's fraud claims based on these statements fail to state a claim.

---

[4] For example, the 2011 statement referencing the value of preventing infection during cancer treatment was made in an online publication in Oncologistics Magazine. (FAC ¶ 132 n.15.) There is no allegation that the statement related to MII or the PFS Program. In addition, the 2022 statement "[w]e expect our manufacturing trading partners to follow those guidelines" refers to manufacturing trading partners, and the statement is presumably related to following trade guidelines.

2.      **Reliance and Causation**

Independent of the failure to plead a fraud claim premised on generalized statements, Defendants argue that UHS's fraud claims fail because the FAC does not plausibly allege that UHS relied on any such statements to its detriment.

Reliance and causation are elements of common law fraud.  However, in claims involving consumer fraud statutes, rather than pleading common law reliance, a plaintiff must establish a "causal nexus" between the challenged conduct and the asserted damages.  *See State v. Minn. Sch. of Bus., Inc.*, 935 N.W.2d 124, 137 (Minn. 2019) (reiterating that direct proof of reliance is not required to establish a causal nexus in a case brought by the Attorney General for consumer fraud); *Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 12 (Minn. 2001) (explaining that to state a claim under misrepresentation statutes, a plaintiff must plead conduct prohibited by the statute and that the plaintiff was damaged).  Thus, claims under the Minnesota statutes still provide that "causation is a necessary element in a damages claim under the misrepresentation in sales statutes" as such statutes "authorize[] a damages action only by someone injured *by* a violation."  *Id.* at 13-14.  And courts have dismissed claims for failure to plead a causal nexus in statutory fraud claims.  *See, e.g.*, *Knotts v. Nissan N. Am., Inc.*, 346 F. Supp. 3d 1310, 1327 (D. Minn. 2018) (dismissing a claim for failure to allege a causal nexus); *Wiegand v. Walser Auto. Grps., Inc.*, 683 N.W.2d 807, 812 (Minn. 2004) (explaining that dismissal on a Rule 12 motion is appropriate if a plaintiff cannot allege a causal nexus).

Most of the statements that UHS claims caused it harm were made after Defendants' PFS Program ended in 2014.  There is no dispute that the MII facility, which

ran the PFS Program, closed in early 2014 and, in this action, UHS seeks damages for fraud that occurred between 2001 and 2014. Because these statements were made after 2014, they could not have been received and relied on by UHS. Indeed, the FAC does not allege facts from which it could be plausibly inferred that UHS reimbursed claims for PFSs because of those alleged statements. *See In re St. Jude Med., Inc.*, 522 F.3d 836, 838 (8th Cir. 2008) (noting that in a fraud case, a plaintiff must show that he or she received the alleged misrepresentation and relied on it); *In re Digi Int'l, Inc. Sec. Litig.*, 6 F. Supp. 2d 1089, 1103 (D. Minn. 1998) (explaining that stock purchasers could not state a fraud claim based on stock shares that were sold before the allegedly fraudulent statements).[5] Moreover, even using the less stringent "causal nexus" requirement for statutory fraud claims, UHS has not adequately alleged a nexus between these statements and any alleged harm to it. Therefore, these statements cannot support a fraud claim.

---

[5]     UHS cites *Yarrington v. Solvay Pharmaceuticals, Inc.*, No. A05-2288, 2006 WL 2729463 (Minn. Ct. App. Sep. 26, 2006). That case involved consumer-fraud claims against a pharmaceutical company in relation to its marketing of a hormone-replacement therapy as FDA-approved when the applications for approval were still pending. *Id.* at *1. The Minnesota Court of Appeals held that the plaintiff sufficiently pled statutory fraud, but not common law fraud because she could not show that her physician had relied on the FDA-approved statements when making a prescribing decision. *Id.* at *4-5. While recognizing that Minnesota consumer-fraud statutes "make it easier to sue for consumer fraud" than under common law by eliminating the need to plead individual consumer reliance on an alleged misrepresentation, the court also stated that causation remains an element of such a claim and found that the plaintiff sufficiently alleged causation by identifying multiple examples of the manufacturer affirmatively stating that the drug was "indicated" for treating specific symptoms (including in a widely used Physicians' Desk Reference) and that the alleged statements "caused" the prescription decisions by physicians. *Id.* at *5. Here, however, UHS has not alleged any such wide distribution of specific statements or a causal nexus between such statements and its alleged damages.

The Court acknowledges that UHS alleges, on information and belief, that Defendants' website was "materially consistent" over time and that "other ABC statements . . . from the relevant time period" exist.  (FAC ¶¶ 122 & n.8, 132 & n.15.) These allegations, however, are not enough to satisfy Rule 9(b)'s specificity requirement. An exception to the specificity requirement might apply if the alleged facts constituting fraud "are peculiarly within the opposing party's knowledge" and "the allegations are accompanied by a statement of facts on which the belief is founded."  *See Drobnak v. Andersen Corp.*, 561 F.3d 778, 783-84 (8th Cir. 2009.)  UHS does not provide any such statement of facts to support the broad allegation that the allegedly fraudulent statements were made consistently over time.  *Id.*  Therefore, these allegations do not satisfy Rule 9(b).[6]

**B.    Statements Made to Third Parties (Providers and Regulators)**

UHS also argues that Defendants engaged in fraud by making false statements to health care providers and regulators to mislead them into believing that the PFS products were compliant with the law and safety practices.  The statements to third parties include (1) affirmative representations that its PFSs contained FDA approved drugs (FAC ¶ 172); and (2) affirmative representations in 2012 and 2013 that MII was a pharmacy (FAC ¶¶ 168, 310).

---

[6]    UHS also argues that two of these statements occurred while UHS was still paying for PFSs through 2016.  These statements are the "follow of the letter of the law" and "err on the safe side" statements.  (FAC ¶ 125.)  Even if the timing of UHS's payments could demonstrate causation and reliance or a causal nexus, as discussed above, these statements are too unspecific and vague to support a fraud claim.

As a threshold matter, the parties dispute whether this theory of fraud is actionable under Minnesota law.  Defendants argue that under relevant precedent, UHS cannot sustain a fraud claim based on representations to a third party but not passed on to UHS. *See Bank of Montreal v. Avalon Cap. Grp., Inc.*, No. 10-cv-591, 2012 WL 1110691, at *7 (D. Minn. Apr. 3, 2012) (explaining that a plaintiff cannot sustain a misrepresentation claim based on a representation to a third party without evidence that the misrepresentation to the third party was conveyed to the plaintiff).  Defendants also point to at least two courts that have held that Minnesota law does not recognize a claim for fraudulent misrepresentation based on a defendant's statement to a third party, such as a regulator.  *Sioux Biochemical Inc. v. Cargill, Inc.*, 410 F. Supp. 2d 785, 796-97 (N.D. Iowa 2005) (noting that the plaintiff had not cited any Minnesota case recognizing a claim for fraudulent misrepresentation based on a defendant's statement to a third party, such as the PTO); *Flynn v. Am. Home Prods. Corp.*, 627 N.W.2d 342, 350 (Minn. Ct. App. 2001) (explaining that the appellant had not presented Minnesota authority supporting the extension of the duty to third parties).  Even so, the Court considers Defendants' additional arguments that this theory of fraud fails because UHS has not adequately pled a false statement, reliance, or causation.

### 1.    False Statements

#### a.    *FDA-Approved*

UHS alleges that Defendants fraudulently represented that the PFSs contained FDA-approved drugs.  In the FAC, UHS alleges that the PFSs were "distinct from the original" FDA-approved products and "constituted unapproved New Drugs under the

FDCA." (FAC ¶ 172.) The change from the original drug occurred when Defendants switched the "drug product from the glass vials . . . into plastic syringes." (*Id.* ¶ 251 (quoting Misdemeanor Information ¶ 69, *United States v. AmerisourceBergen Specialty Grp., LLC*, No. 17-CR-507 (E.D.N.Y. Sep. 27, 2017)).) Defendants, however, maintain that this statement was truthful because the medication in the syringes came from vials of FDA-approved drugs.

The FDCA defines a "new drug" as:

> Any drug . . . the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof.

21 U.S.C. § 321(p)(1). Here, there is no dispute that the "composition" of the drugs in the vials that filled the PFSs was FDA-approved medication. The Court concludes that the representation of the PFSs as containing FDA-approved medication could be a reasonable interpretation of the FDCA. *Cf. Olson v. Fairview Health Servs. of Minn.*, 831 F.3d 1063, 1070 (8th Cir. 2016) (explaining that a statement is fraudulent only if "there is no reasonable interpretation of the law that would make the allegedly false statement true" in the context of a False Claims Act). The Court concludes that this statement does not support a fraud claim.

### b.    *MII Is a Pharmacy*

Next, UHS argues that Defendants falsely claimed that MII was a pharmacy. UHS points to an admission in the context of the DOJ settlement that MII did not qualify as a pharmacy (FAC ¶ 178), or if it did, that it was licensed only insofar as Defendants

defrauded the licensing authorities to obtain a license. Defendants argue, however, that the claim that MII operated as a pharmacy was truthful.

Upon review, the Court concludes that in the context of the DOJ settlement, Defendants did not admit that MII was not a pharmacy. Instead, Defendants acknowledged that MII was not registered as a repackager and did not qualify for a registration exemption in the state of Alabama. (FAC, ¶ 257 n.27.) In addition, per the corresponding plea agreement, MII was a licensed pharmacy in multiple states during the relevant time period. (Plea Agreement, Attachment 1, Exhibit B to the DOJ Settlement, ¶¶ 9-10 ("MII did not qualify for the exemption to the registration requirement . . . *for pharmacies* that maintained establishments in conformance with applicable local laws regulating the practice of *a pharmacy*." (emphasis added)).) UHS has not sufficiently alleged that Defendants' assertions that MII was a pharmacy are false.

## 2.    Causation and Reliance

Defendants also move to dismiss UHS's fraud claims based on statements to third parties arguing that, even if the above statements—or the other statements that UHS alleges Defendants falsely made to providers and regulators, were false, UHS has not sufficiently pled that UHS received or relied on the statements.

To demonstrate causation and reliance, UHS alleges that Defendants' statements about the PFSs being FDA-approved "caused providers to submit fraudulent claims for reimbursement" and the UHS "relied on the information." (FAC ¶ 175.) This, however, does not satisfy Rule 9(b), which requires more than "conclusory assertions." Indeed, UHS has not alleged any specifics about what false information was part of the insurance

16

claim submissions or whether any of the allegedly fraudulent information was actually contained in claim reimbursement forms.  In addition, UHS has not alleged with specificity whether any of the allegedly false information made its way to UHS or who at UHS relied on the information.

In addition to the statements discussed above, UHS claims that Defendants made other misrepresentations to providers and regulators.  These statements include representations that the PFSs did not contain pooled overfill; that each syringe contained medicine from only a single vial; that the PFSs were prepared aseptically and were not contaminated; that it was legal to bill for the vials; that the syringes had pedigree, expiration dates, identity, and characteristics represented in the packaging, coding, and billing; and that the PFSs had the assurance of safety under relevant guidelines.  UHS alleges that Defendants are liable to them for fraud based on these statements because Defendants "made specific misrepresentations directly to state officials in MII's state pharmacy license applications and inspection reports" (FAC ¶ 158) and made misrepresentations and omissions during the accreditation process.  However, similar to the statements made to providers, UHS has failed to allege that any such information was passed onto UHS, that UHS relied on any such statements to its detriment, or that there is a causal nexus between the statements and any damages to UHS.

UHS attempts to invoke the doctrine of indirect reliance to this case where the "'effect of the [Defendants'] misstatements' . . . was passed on to UHS."  (Doc. No. 86 at 25.)  In support, UHS relies primarily on *Corp. Commission of Mille Lacs Band of Ojibwe Indians v. Money Centers of America, Inc.*, No. 12-cv-1015, 2012 WL 5439170

(D. Minn. Nov. 7, 2012). In *Corp. Commission of Mille Lacs Band of Ojibwe Indians*, plaintiff sued defendant, who it had retained to perform cash-access services in its casinos, for breach of contract, fraud, and other claims. *Id.* at *1. Plaintiff's fraud claims were based on the defendant's alleged false statements in its vendor-license application to the Gaming Regulation Authority ("GRA")—that it had been granted a gaming-related contractor certificate, that it had not been questioned by any law enforcement agency, and that it was not a party to a lawsuit. *Id.* at *5-6. Applying tribal law, the Court concluded that the plaintiff had adequately pleaded a fraud claim based on the defendant's misrepresentations to the GRA. *Id.* at *7. With respect to the reliance element, the Court explained that direct communication between the parties was not necessary where defendant intended or had reason to expect that its statements to a third party would be communicated to the plaintiff and influence the plaintiff's conduct. *Id.*

Here, the Court respectfully concludes that the facts of this case are distinguishable. Defendants' alleged statements to the third parties are not specific and UHS has not sufficiently alleged that the "effect" of the statements reached UHS. *See Luckey*, 245 F. Supp. 3d at 1094 (dismissing fraud claims under the theory of indirect reliance where there was no allegation that misrepresentation was communicated to the plaintiffs). In particular, there is no allegation in the FAC that would show that UHS received or relied on the substance of any alleged misrepresentations made to the state pharmacy boards and physicians.

For the above reasons, the Court concludes that UHS's fraud claims based on allegedly fraudulent claims to providers and regulators are properly dismissed.

18

### C.    Omissions

UHS alleges that Defendants fraudulently omitted information about the PFS

Program.  Under Minnesota law, "[n]ondisclosure is fraudulent only if the defendant had

a legal or equitable obligation to disclose to a plaintiff who was entitled to receive the

information." *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 985 (8th Cir. 2008).

Further, "Minnesota law does not appear to recognize any duty to disclose information to

third parties with whom no relationship exists." *Id.* (citing *Flynn*, 627 N.W.2d at 350);

*see also Karlstad State Bank v. Fritsche*, 392 N.W.2d 615, 619 (Minn. Ct. App. 1986)

(finding no fiduciary relationship existed where parties had no direct contacts).

Here, Defendants did not submit claims directly to UHS for payment.  Rather,

providers would purchase PFSs from Defendants, Defendants would deliver the PFSs to

the providers, the providers would administer the PFS to the patient, and the providers

would submit the claim for reimbursement to a healthcare plan, some that UHS serviced.

Based on the allegations in the FAC, there is no direct relationship between Defendants

and UHS.  And therefore, there is no duty for Defendants to disclose information to UHS.

Despite the rule in Minnesota, UHS contends that it has plausibly alleged a claim

for omission liability based on Defendants' misleading partial disclosures.  In support,

UHS cites to Minnesota law on the basic elements of fraudulent omission.  *See, e.g.*,

*Rochester Methodist Hosp. v. Travelers Ins. Co.*, 728 F.2d 1006, 1017-18 (8th Cir. 1984)

(collecting cases for the proposition that once one undertakes to speak on a matter, he

must not suppress facts which materially qualify the facts stated); *Johnson v. Hewlett-*

*Packard Co.*,  No. CX-01-1641, 2002 WL 1050426, at *3-6 (Minn. Ct. App. May 22,

2002) (concluding that fraud claim survives a motion to dismiss where a fact issue exists as to whether it is misleading to say that an ink cartridge is included without saying how much ink is in the cartridge). UHS argues that, under this line of cases, Defendants' stated half-truths that are actionable; for example, that MII was a pharmacy and, via the use of product labeling, that the PFSs were FDA-approved, produced in regulatory compliance. The Court concludes that, on the facts of this case, there is no reason to extend the duty to disclose information to UHS as a third party.[7] And again the Court notes that neither statements—that MII was a pharmacy or that the PFSs contained FDA-approved drugs—were fraudulent.

## II.    Unjust Enrichment

UHS asserts a claim for unjust enrichment/money had and received. UHS claims that it "conferred direct benefits" on the Defendants when it reimbursed claims for PFSs made by providers or patients. (FAC ¶ 403.) UHS further alleges that it would be inequitable for the Defendants to retain the payments and that instead those benefits be paid to UHS. (*Id.* ¶¶ 405-07.)

---

[7]    The Court also notes that the cases relied upon by UHS are factually distinct, for example, they involved specific half-truths provided by one party to another party in the context of a specific transaction. *See, e.g.*, *Simonsen v. BTH Props.*, 410 N.W.2d 458, 460 (Minn. Ct. App. 1987) (finding possible misrepresentation in a transaction to sell an apartment building where buyer represented that there were six rentable units when there were only five). In addition, this case does not present the rare situation where asymmetrical dealing would implicate a "special knowledge" exception to the rule that there is no general duty to disclose. *See generally Song v. Champion Petfoods USA, Inc.*, Case No. 18-3205, 2020 WL 7624861, at *11 (D. Minn. Dec. 20, 2020) (noting that Minnesota courts "almost never" find that the "special knowledge" exception applies).

To state a claim for unjust enrichment under Minnesota law, UHS must allege that Defendants "knowingly received something of value to which [it] was not entitled and that the circumstances are such that it would be unjust for [it] to retain the benefit." *Ciofoletti v. Securian Fin. Grp., Inc.*, No. 18-cv-3025, 2020 WL 12863773, at *8 (D. Minn. Sep. 21, 2020) (alterations in original) (quoting *Mon-Ray, Inc. v. Granite Re, Inc.*, 677 N.W.2d 434, 440 (Minn. Ct. App. 2004)); *see Qwest Commc'ns Co. v. Free Conferencing Corp.*, 990 F. Supp. 2d 953, 981 (D. Minn. 2014). Unjust enrichment is an equitable doctrine, requiring a showing of a quasi-contract or a contract implied-in-law. *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012), *superseded by statute on other grounds*, Act of April 29, 2013, ch. 27, § 1, 2013 Minn. Laws 122, 122, *as recognized in*, *Hall v. City of Plainview*, 954 N.W.2d 254, 271 (Minn. 2021). In addition, "an action for money had and received can be maintained whenever one man has received or obtained the possession of the money of another, which he ought in equity and good conscience to pay over." *Youngstown Mines Corp. v. Prout*, 124 N.W.2d 328, 346 (Minn. 1963) (citation modified).

UHS pleads that Defendants' PFS products were sold to providers or pharmacies and that UHS's reimbursement payments went to providers, pharmacies, or patients. UHS does not plead that it paid Defendants or that Defendants retained any of UHS's money. Indeed, UHS and Defendants had no relationship. Because UHS has not alleged any connection with Defendants that would give rise to Defendants owing UHS a legal obligation, UHS's unjust enrichment claim fails as a matter of law. In addition, UHS has not alleged money it spent reimbursing claims made by providers or pharmacies went to

Defendants. The FAC lacks allegations of an essential element of unjust enrichment—that Defendants unjustly received a benefit, the cost of which that was born by UHS. In addition, UHS fails to adequately plead a claim for money had and received because such a claim will not lie against a party who has not been unjustly enriched. *See Commonwealth Land Title Ins. Co. v. Sec. Pac. Bus. Credit, Inc.*, No. C7-96-561, 1996 WL 523815, at *2 (Minn. Ct. App. Sep. 17, 1996).

## III.    Timeliness

In the April 2024 Order, the Court found that UHS's claims were time-barred. The Court later allowed UHS to amend its complaint. The Court concludes that UHS's additional allegations in the FAC do not cure the untimeliness of their claims. Indeed, the specific fraud allegations in the FAC further highlight the untimeliness of their claims. On the one hand, UHS claims that it lacked knowledge of any public disclosure about the PFS Program before November 2016, and that they could not have discovered the fraud, despite public disclosures beginning in 2012, until after November 2016. Yet, on the other hand, UHS asserts that it relied on statements made by Defendants well before 2016 in support of its fraud claims. UHS's theory—that it could not have discovered the alleged fraud before 2016—is inconsistent with the theory that UHS was at the same time attuned to and relying on the various statements made by Defendants years before as discussed above. Moreover, UHS has not sufficiently alleged any fraudulent concealment that would toll any of the statutes of limitations. UHS relies on allegations that Defendants held MII out to be a pharmacy and for using false packaging, but as discussed above, UHS has not adequately pled that Defendants made any

affirmatively fraudulent statements to UHS.  The allegedly concealing conduct is based on conduct by Defendants that was directed to physicians, regulators, or the public, *not* UHS.  In addition, the FAC does not adequately allege that UHS could not have discovered any alleged concealment with reasonable diligence given the public disclosures beginning in 2012.  For all of these reasons, the Court finds that UHS's claims are untimely.

## CONCLUSION

The Court acknowledges that the conduct alleged in the FAC involves significant misconduct with regard to government healthcare programs by Defendants.  By dismissing UHS's claims, the Court does not ignore Defendants' misconduct or allow Defendants to escape the consequences for their actions.  There have already been significant False Claims Act settlements and corresponding criminal penalties.  Instead, UHS, as a commercial health insurer, has not adequately alleged any claims against Defendants for the same behavior that has already resulted in legal consequences.

## ORDER

Based upon the foregoing and the record in this case, **IT IS HEREBY ORDERED** that:

1.    Defendants' motion to dismiss Plaintiff's First Amended Complaint (Doc. No. [80]) is **GRANTED**.

2.      All claims in the First Amended Complaint (Doc. No. [77]) are

**DISMISSED WITH PREJUDICE**.

    **LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  October 2, 2025              s/Donovan W. Frank
                                    DONOVAN W. FRANK
                                    United States District Judge